## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN DOE,** | : | |
| *Plaintiff* | : | |
| | : | |
| **v.** | : | **Civil Action No.** |
| | : | |
| **THE PENNSYLVANIA STATE** | : | |
| **UNIVERSITY; DANNY SHAHA, in his** | : | |
| **individual capacity and official capacity** | : | **Filed Via ECF** |
| **as Senior Director of the Office of Student** | : | |
| **Conduct; KAREN FELDBAUM, in her** | : | |
| **individual and official capacity as** | : | |
| **Associate Director of the Office of** | : | |
| **Student Conduct; SPENCER PETERS,** | : | |
| **Office of Student Conduct Investigator** | : | |
| | : | |
| *Defendants* | : | |

## COMPLAINT

Plaintiff, John Doe,[1] a former Penn State student and a seventeen-year old freshman at the time of the incident, files this civil rights lawsuit under Section 1983 and the Due Process clause of the 14th Amendment to the United States seeking damages and to invalidate a two-semester university disciplinary suspension based upon a finding that he had violated the University's Title IX policies. This sanction and the attendant disciplinary record were the product of a

---

[1] Contemporaneously with the filing of this Complaint, Plaintiff is filing a Motion for Permission to Proceed Under Pseudonym, seeking permission of the Court to proceed anonymously given the extremely sensitive and private nature of the matters alleged herein. Plaintiff refers to the female complainant in the underlying student disciplinary proceeding as "Jane Roe". As more fully set forth in the Motion, the University is fully aware of the actual identities of John Doe and Jane Roe and will not be prejudiced in any way by John Doe's use of those pseudonyms for public filings.

constitutionally-flawed disciplinary process that deprived Mr. Doe of the most basic due process protections, including the rights to a hearing and to be heard, to testify in person, to call witnesses on his own behalf, to cross-examine his accuser and adverse witnesses, to the meaningful assistance of an attorney, and to a fair and unbiased tribunal.

Although at the time of the incident, Penn State's Office of Student Conduct had long used an adjudicatory process that provided many of these fundamental protections, its then Senior Director chose instead to adjudicate a sexual misconduct allegation levied by an 18-year-old Penn State freshman by using its "Investigative Model," a Title IX policy it enacted several months after the alleged misconduct occurred.  This new Title IX disciplinary regime, which the Senior Director chose to use over the traditional due process model, does not provide the accused with a hearing, does not permit the accused to call witnesses or cross-examine his accuser or other adverse witnesses, and does not permit the fact-finder, known as the "Title IX Decision Panel," to meaningfully assess credibility by hearing the testimony of witnesses and observing their demeanor while testifying.  Rather, under the Investigative Model, a "Title IX Investigator" is delegated a "fact finding" role and then submits a written "Investigative Packet" to the Panel, which was then tasked with determining witness credibility, responsibility, and sanctions using nothing more than this Packet in conjunction

with inflammatory and biased "instructive" material provided to them by the Office of Student Conduct.

Mr. Doe files this lawsuit because the defendants, through their use of Penn State's Investigative Model, denied him his right to due process and continues to deprive him of his right to an education, his Penn State degree, and sullies his reputation and jeopardizes his future livelihood.

## PARTIES

1.     Plaintiff John Doe is an adult male who, until the University suspended him in January 2016, was a student at the Penn State University, University Park, Pennsylvania.  Plaintiff now resides with his parents in Hicksville, New York.

2.     Defendant The Pennsylvania State University ("Penn State") is an educational institution established and operated by the Commonwealth of Pennsylvania with its principal place of business at 201 Old Main, University Park, Pennsylvania.  Penn State operated under the color of state law at all times relevant to the complaint.

3.     At times relevant to this complaint, Defendant Danny Shaha was Penn State's Senior Director of the Office of Student Conduct (OSC) and Deputy Title IX Coordinator at its University Park, Pennsylvania, campus. Mr. Shaha is now

Penn State's Interim Assistant Vice President for Student Affairs. Defendant Shaha is being sued in his individual capacity.

4.     At times relevant to this complaint, Defendant Karen Feldbaum was Associate Director of the Office of Student Conduct.  Ms. Feldbaum is now Penn State's Interim Senior Director of the Office of Student Conduct at its University Park, Pennsylvania, campus.  Defendant Feldbaum is being sued in her individual capacity.

5.     At the time of the disciplinary investigation, Defendant Spencer Peters was an investigator with the Office of Student Conduct at its University Park, Pennsylvania, campus. Prior to working with OSC, Mr. Peters was an investigator with the Penn State University Police who participated in a parallel criminal investigation targeting Mr. Doe.  Defendant Peters is being sue in his individual capacity.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over Plaintiff's claims arising under the United States Constitution and 42 U.S.C. §§ 1983 and 1988 pursuant to 28 U.S.C. §§ 1331 and 1343.

7.     This Court has authority to issue the declaratory and injunctive relief sought in this matter pursuant to 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Federal Rules of Civil Procedure 57 and 65.

8.     This Court has venue for this claim pursuant to 28 U.S.C. § 1391. The defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

**A.     Penn State adopts and pilots an "Investigative Model" to adjudicate student sexual misconduct claims.**

9.     Less than two months after taking office in May 2014, Penn State University President Eric Barron announced the formation of a Task Force on Sexual Assault and Sexual Harassment and charged it with making recommendations that would allow the University to "become the benchmark by which other universities are judged when it comes to sexual misconduct prevention and response." *See* Exhibit 1, *Task Force on Sexual Assault and Sexual Harassment Report*, January 23, 2015, p. 1; http://www.psu.edu/ur/2014/Task_Force_final_report.pdf, hereafter the "Report."

10.     In its January 23, 2015, final report, the Task Force acknowledged that the context for its recommendations included:

> a growing national debate about higher education's response to the problem of sexual and relationship violence. The White House and Congressional leaders, spurred by student activists on college and university campuses, convened various groups to discuss the issue. Multiple federal guidelines were published. National higher education organizations sponsored related

conversations across the country. The nation's news media increasingly focused their attention to the conflicts inherent in the problem. And the Department of Education continued to add new schools to its list of those colleges and universities under investigation for Title IX concerns—a sum that numbered eighty-six by early November, many of them among the most notable higher education institutions in the country, including Penn State.

11.    Less than a month later, President Barron adopted each of the Task Force's 18 recommendations, including its recommendation that "the student conduct process at each campus move away from the traditional hearing process and embrace instead an investigative model for resolving sexual misconduct cases."

12.    This "Investigative Model" "would rely upon a professional investigator, rather than a hearing board, to conduct the required fact finding in [sexual misconduct] cases."

13.    According to the Task Force, the Investigative Model would strike a balance between obtaining fair, accurate outcomes while avoiding the "undue stress and other harm too often caused by the current hearing model."

14.    At the request of Defendant Barron, Defendant Shaha revised Penn State's student discipline procedures to comply with the Report's recommendations. An April 29, 2015 *Penn State News* article announced that the Office of Student Conduct had begun "piloting" the model and expected to permanently implement it

in the Fall of 2015. The procedures in effect at all times relevant to this case are set forth in a document accompanying this Complaint as Exhibit 2, Code of Conduct & Student Conduct Procedures, hereafter "the Procedures."

15.    Prior to the inception of the Investigative Model, contested disciplinary proceedings addressing claims of sexual misconduct required a hearing where witnesses testified in person before a fact-finder and were subject to cross-examination.

16.    The Investigative Model dispensed with these requirements.

17.    President Barron delegated authority to the Office of Student Conduct's "Senior Director", then Defendant Shaha, to decide which prosecutorial model to use in Title IX sexual misconduct cases: the "investigative" model or the "hearing" model.

18.    The Senior Director of the Office of Student Conduct is designated by the University President to be responsible for the administration of the Code of Conduct and the student conduct process. At the time of adjudication, Mr. Shaha was the Senior Director.  Ms. Feldbaum is currently the Senior Director.

19.    The revised policy provided Defendant Shaha with discretion to choose the procedural regime – "investigative" or "traditional" – used to adjudicate Title IX sexual misconduct disciplinary claims.

20.    The Investigative Model prohibited live witnesses from appearing, in any form, before the adjudicative body: the Title IX Panel.

21.    Instead, an investigator meets with the complainant and the respondent, both of whom "may provide written statements, witness names, and other information related to the allegation."

22.    The investigator then "meet[s] and obtain[s] information from possible witnesses."

23.    Following this "initial investigative stage," the investigator produces "an Investigative Packet" available for review by both the complainant and respondent.

24.    Either party may, after review of the Packet, respond to its contents.

25.    After this review and response, the investigator "address[es] and correct[s], if appropriate, any factual inaccuracies, misunderstanding, etc., and may also conduct additional investigation as appropriate."

26.    If the Investigator determines that the information in the Investigative Packet "does not reasonably support a Code of Conduct violation, the case is closed without charges."

27.    If, on the other hand, the Investigator determines that "the acquired information reasonably supports a Code of Conduct violation," charges are

assigned and both the complainant and the respondent are "given an opportunity to provide a response to the charges."

28.    This "response to the charges" is provided to the investigator for inclusion in the Investigative Packet.

29.    Upon receipt of these responses, the Investigative Packet, the investigator's decision that his investigation reasonably supported a Code of Conduct violation, and other "instructive" materials are forwarded to the Title IX Decision Panel, defined as:

> a specific group of faculty and staff authorized by the Senior Director to review cases alleging Title IX violations that have been assigned to it, to determine whether a student has violated the Student Code of Conduct, and to assign sanctions in response to violation(s).

30.    On the basis of its consideration of the Investigative Packet and the "instructive" materials, the Title IX Panel "review[s] the case and make[s] a decision of responsibility / non-responsibility based on the preponderance of evidence standard." When "responsibility" is assigned, the Panel also determines which sanctions to impose.

31.    The policy prohibited witnesses from appearing personally before the Title IX Panel.

32.    The policy prohibited the respondent from questioning the complainant or any adverse witnesses, either directly or indirectly, in front of the Panel.

33.    The Title IX Panel issues its decision based solely on the investigator's Investigative Packet and the "instructive" material, as described below, provided to them by Ms. Feldbaum:

   a.    *Considerations in a Sexual Misconduct Hearing*

   b.    *Decision Model for Sexual Misconduct*

   c.    *Incapacitation Document for Hearings*

   d.    *Preponderance Statement for Hearings*

   e.    *The Response Continuum: From Written Consent to Self-Defense*

A copy of each of the above documents accompanies this Complaint as Exhibits 3-7 respectively.

34.    The document provided to the Panel entitled *Considerations in a Sexual Misconduct Hearing* contained a "Considerations on Behalf of the Alleged Victim" section instructing the Panel that only 2% of sexual assault accusations are false.

**B.**     **The Defendants' use of the Investigative Model is used to suspend Mr. Doe**

35.     John Doe is presently 21 years of age and lives with his parents in Hicksville, NY.

36.     Mr. Doe enrolled in The Pennsylvania State University ("Penn State"), University Park campus and began taking classes when he was 17 years old during the 2014 summer session.

37.     During that session, Mr. Doe met and became friendly with Jane Roe, an 18-year-old Penn State summer session freshman, who would later become the "complainant" in defendant's PSU disciplinary process.

38.     On August 9, 2014, Ms. Roe and Mr. Doe were Penn State University summer session students together and lived in the same dorm and travelled in the same social circle.

39.     On the evening of August 9, 2014, Ms. Roe began drinking between 10:30 p.m. and 10:40 p.m. and then went to a fraternity party with her friends where she danced and continued to drink.  John Doe was also at the party.

40.     Ms. Roe left the party with her friends and walked part of the way home with another boy who she claims to have held on to in an attempt to avoid being detected by the police as someone who may have illegally consumed alcohol.

41.     Shortly after Ms. Roe and the boy split up, John Doe came up beside her and walked with her the rest of the way to the dorm in which they both lived. Ms. Roe and Mr. Doe began "making out" on the elevator.  Ms. Roe, who claims that she had previously believed that Mr. Doe was gay, was "fine" with making out: "Like, this is college." Ms. Roe went into John Doe's room without objection or resistance.  The two engaged in sexual acts in Mr. Doe's room.

42.     According to Ms. Roe, Mr. Doe engaged in nonconsensual vaginal, oral and anal intercourse with her.

43.     Mr. Doe, on the other hand, denied engaging in any nonconsensual sexual conduct with Ms. Roe.

44.     Ms. Roe left Mr. Doe's room after the sexual contact concluded and then returned a few minutes later to retrieve an earring she left behind.

45.     Ms. Roe went to the hospital the next day claiming that she had lacerated her vagina. She initially denied that she was sexually assaulted and later refused to provide John Doe's name to the police (who interviewed her at the hospital) or her treatment providers; and refused to file a police report.   On September 15, 2014, the University police placed the case on "inactive" status after unsuccessfully trying to engage Ms. Roe in the investigative process.

46.     In May of 2015, ten months later, Ms. Roe levied a sexual assault complaint with the police and the University's Office of Student Conduct after seeing Mr. Doe "walking by" in the student union building.

47.     On information and belief, on or about May 8, 2015, Ms. Roe met with Penn State's Office of Student Conduct "Title IX investigator" Spencer Peters, a former University police investigator who was a part of the initial criminal investigation in this case.  A Penn State police investigator Vickie Litzinger, who had worked the case with Mr. Peters when he was her colleague, was also present. Following the meeting, OSC Senior Director Shaha initiated Penn State's formal disciplinary process against Mr. Doe.

48.     On September 4, 2015, the Office of Student Conduct issued an "Administrative Directive" to Mr. Doe ordering him to have "no contact" with Ms. Roe.  A copy of the Administrative Directive accompanies this Complaint as Exhibit 8.

49.     On September 10, 2015, Karen Feldbaum, then Associate Director of the Office of Student Conduct, sent Mr. Doe a "Notice of Investigation" informing him that that "the Office of Student Conduct [was] investigating an allegation that he was involved in behaviors that violated the Student Code of Conduct," and attaching the "no contact" directive. A copy of the Notice of Investigation accompanies this Complaint as Exhibit 9.

50.    The document identified, without elaboration or factual detail, that the Office of Student Conduct investigation involved "sexual harassment and misconduct."

51.    The Notice informed Mr. Doe that he would be contacted by Office of Student Conduct staff member Spencer Peters (who had by then left his University police investigator role to become an Office of Student Conduct investigator) for the purposes of "discuss[ing] the allegation" and to provide Mr. Doe with an "opportunity to share [his] perspective."

52.    While the Notice explained to Mr. Doe that he was not "obligated to share information" with Peters, it warned that he was "required to participate [and that] [f]ailure to do so could result in a separate Student Code of Conduct violation, specifically ... Failure to Comply."

53.    The Notice further informed Mr. Doe of the following:

    a.    that he was being subjected to disciplinary process under the "Investigative Model" as defined by the Section V, Subsection D, of the Student Conduct Procedures;

    b.    that he would be entitled to an advisor of his choosing to "accompany" him throughout the process;

    c.    that he was not permitted to record any meetings during the process, nor could he photograph or remove any documents that he was permitted to review "related to the investigation";

    d.    that he would be "permitted to review and comment on the investigative packet prior to it being finalized";

e.     that Peters was a "neutral fact finder" to whom Plaintiff would "be able to provide all evidence, documentation, witnesses, etc., to assist in the investigative process";

f.     that he was "strongly encouraged" to supply such materials to Peters;

g.     that he would be permitted to ask Peters "questions related to the investigative process";

h.     that he "should expect to be asked questions" and that his "honesty [was] expected", and;

i.     that the information obtained during the process was confidential "by federal" law and would only be used in accordance with such.

54.     On September 14, 2015, Ms. Feldbaum sent Ms. Roe a letter announcing the start of the investigation.  A copy of this letter accompanies this Complaint as Exhibit 10.

55.     On September 24, 2015, Mr. Doe provided Mr. Peters with a written narrative of the August 9, 2014, incident via email. A copy of this statement accompanies this Complaint as Exhibit 11.

56.     Mr. Peters, acting either in his capacity as police investigator or OSC investigator, reviewed two surveillance videos of Mr. Doe and Ms. Roe entering the dormitory just prior to the incident.  The video depicted Ms. Roe with her arm around Mr. Doe, showing no signs of intoxication, and voluntarily following him into the building and then to the elevators.  This video is *Brady* material because it contradicted Ms. Roe's statements to the investigator and supported Mr. Doe's

version of the events.  Despite the obvious relevance and potentially exculpatory nature of the videos, Mr. Peters did not permit it to be seen by the Panel.

57.     Even though Mr. Peters' initial involvement in this case was as a police investigator, the University delegated "neutral fact finding" authority to him rather than to another investigator who would not have been a part of and privy to the police investigation.   Peters then conducted an investigation, often in collaboration with the University police, that culminated in the preparation of a "Notice of Charge" sent to Mr. Doe and Ms. Roe on November 11, 2015, announcing that the University was charging Mr. Doe with nonconsensual intercourse and nonconsensual oral sex and informing both parties that they had an opportunity to review and comment on the draft investigation report dated November 10, 2015, but not to have a copy of it.  Copies of the notices of charge accompany this complaint as Exhibit 12.

58.     After Mr. Doe and Ms. Roe were given an opportunity to review and request revisions to the draft report, Mr. Peters presented the final report to Office of Student Conduct Associate Director Karen Feldbaum who provided the Title IX Panel with Mr. Peters' Investigative Report which noted that Peters had already concluded, as a result of his investigation and as "neutral fact finder", that "there was enough information to reasonably support a Student Code of Conduct charge." A copy of the OSC Investigative Report accompanies this Complaint as Exhibit 13.

59.    Ms. Feldbaum also provided the Panel with *Considerations in a Sexual Misconduct Hearing*; *Decision Model for Sexual Misconduct*; *Incapacitation Document for Hearings*; *Preponderance Statement for Hearings*; and *The Response Continuum: From Written Consent to Self-Defense*, cited above and attached at Exhibits 3 to 7.

60.    Although the Panel met on December 17, 2015 to discuss the report, Mr. Doe was not permitted to be present.  No recording was made of the Panel's meeting or deliberations.

61.    On December 23, 2015, the Panel issued its decision finding Mr. Doe "responsible" for violating the Code of Conduct by engaging in nonconsensual intercourse and nonconsensual oral sex and recommended that he be suspended from Penn State for two semesters. A copy of the Panel's decision accompanies this Complaint as Exhibit 14.

62.    Although Mr. Doe never appeared before the Panel, the Panel nonetheless concluded that he had "fail[ed] to provide any information about how he knew that the Complainant consented to sex after she had clearly stated that she had doubts about having intercourse."  The Panel required Mr. Doe to prove he had consent although the burden of proof is supposed to rest on the University.  Mr. Doe would have been able to answer this question had the University permitted

him to appear in person and had the Panel posed the question to him prior to their adjudication.

63.    On December 30, 2015, Ms. Feldbaum emailed Mr. Doe and Ms. Roe a copy of the "Notice of Outcome", which included notification that either or both parties had a right to appeal the decision within five days.  A copy of the notice is attached hereto at Exhibit 15.

64.    As a result of the suspension, Mr. Doe left Penn State University at the end of the 2015 fall semester and has been living in New York State with his family ever since.

65.    On January 13, 2016, John Doe filed an appeal, alleging that the panel had "failed to support their primary findings" and "failed to follow proper procedure."  A copy of Mr. Doe's appeal accompanies this Complaint as Exhibit 16.

66.    Investigator Peters forwarded John Doe's appeal to Assistant Vice President and Associate Dean for Undergraduate Education Yvonne Gaudelius by letter dated January 27, 2016.  A copy of this letter accompanies the Complaint as Exhibit 17.

67.    By letter dated February 3, 2016, Gaudelius denied Plaintiff's appeal and the suspension became effective.   A copy of this letter accompanies this Complaint as Exhibit 18.

68.    On February 10, 2016, then Office of Student Conduct Senior Director Danny Shaha notified Mr. Doe's parents by letter that John Doe had been found "responsible" by the Title IX Decision Panel; that his suspension was in effect January 1 through December 31, 2016; and that he was no longer permitted to be housed on the campus. A copy of this notification accompanies this Complaint as Exhibit 19.

## VIOLATION OF THE DUE PROCESS CLAUSE
## OF THE FOURTEENTH AMENDMENT TO
## THE UNITED STATES CONSTITUTION

69.    The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property without due process of law."

70.    Mr. Doe had a property interest protected by the Fourteenth Amendment in continuing and finishing his education at Penn State University.

71.    Mr. Doe has a liberty interest protected by the Fourteenth Amendment in his good name, reputation, honor and integrity.

72.    The Title IX Decision Panel was required to determine whether Mr. Doe's account of the incident was true or whether Ms. Roe's account was true.

73.    The accuracy of this credibility assessment by the Title IX Panel was essential to minimize the risk of erroneous deprivation of Mr. Doe's constitutional interests.

74. The Panel's ability to observe the demeanor of a witness while testifying is indispensable to an accurate assessment of the witness's credibility.

75. Cross-examination of a witness who testifies is essential to ensure that a fact-finder accurately assesses the witness's credibility.

76. The Defendants violated Mr. Doe's right to due process by refusing to permit him to personally appear and testify before the Title IX Decision Panel.

77. Defendants violated Mr. Doe's right to due process by not requiring that the witnesses against him appear personally to testify before the Panel.

78. Defendants violated Mr. Doe's right to due process by refusing to permit him to present the in-person testimony of witnesses appearing on his behalf to the Panel.

79. Defendants violated Mr. Doe's right to due process by refusing to permit him to cross-examine the witnesses offered against him.

80. Defendants never notified Mr. Doe prior to the submission of his case to the Panel, that it provided "instructive" documents to guide their decision-making process, and therefore deprived him of an opportunity to rebut them.

81. Defendants violated Mr. Doe's due process rights to notice and an opportunity to be heard on the statements contained in these documents.

82.     Defendants violated Mr. Doe's due process right to an impartial tribunal by providing the Panel with inflammatory, biased, and un-rebutted "instructive" materials causing the Panel to be biased against him.

83.     By providing the Panel with *de facto* expert witness testimony in advance of the submission of Mr. Doe's case to the Panel, the Defendants violated his due process right to contest the testimony of adverse witnesses.

84.     By not requiring that the authors of these materials appear and testify, the Defendants violated Mr. Doe's due process right to cross-examine adverse witnesses.

85.     Defendants violated Mr. Doe's due process right to an impartial tribunal by advising the Panel that the Investigator's "neutral fact-finding" led him and the Office of Student Conduct to a determination that it was "reasonable to conclude" that Mr. Doe violated the University's sexual misconduct policy.

86.     Defendants violated Mr. Doe's due process right to an impartial "fact finder" by tasking Mr. Peters as investigator and "neutral fact finder" given that he had previously participated in the matter as a police investigator.  Neither Mr. Peters nor any other person disclosed this fact to Mr. Doe prior to the imposition of the suspension.

87.     Defendants violated Mr. Doe's due process right to a fair process by not disclosing potentially exculpatory material to him or the Panel.

88.     Defendants violated Mr. Doe's due process right to a fair hearing by requiring him to prove that he had Ms. Roe's consent thereby shifting the burden from the University to the accused.

89.     Penn State's Office of Student Conduct is charged with enforcing the Code of Student Conduct.  In this respect, OSC serves a prosecutorial function.

90.      University President Barron authorized and then adopted the Task Force's recommendation thereby implementing the Investigative Model.   Mr. Barron also delegated authority to Defendant Shaha to decide which prosecutorial model to use in a Title IX sexual misconduct investigation.

91.     Defendant Shaha was responsible for authorizing faculty and staff to serve on the Title IX Decision Panel.

92.     When the Title IX Decision Panel reviewed Mr. Doe's case, its members would have known that the Senior Director authorized the initiation of the disciplinary process and that the investigator, who was also the "fact finder", had determined that the allegations "supported" violations of the Code of Student Conduct.

93.     The vesting of both prosecutorial and judicial functions in the Office of Student Conduct deprived Mr. Doe of his due process right to a fair and impartial tribunal.

94.     The Defendants violated due process by failing to provide Mr. Doe with a disciplinary process commensurate with the seriousness of the charges and the magnitude of the constitutionally protected interests at stake.

95.     As a direct and proximate result of the aforementioned due process deprivations, Mr. Doe has been wrongly disciplined and is suffering ongoing harm to his right to an education and other protected constitutional interest.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff prays that the Court award the following relief:

(i)      a declaration that Penn State's "Investigative Model" for adjudicating Title IX sexual misconduct cases violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

(ii)     an injunction requiring that the Senior Director of the Office of Student Conduct reverse the Title IX Decision Panel's finding that Plaintiff was "responsible" for violating the code of conduct by engaging in nonconsensual intercourse and nonconsensual oral sex;

(iii)    an injunction requiring that Penn State President Eric Barron reinstate Plaintiff as a student in good standing at Penn State;

(iv)     an injunction requiring that the Senior Director of the Office of Student Conduct cause to be expunged Plaintiff's disciplinary record and remove any record of disciplinary contact from Penn State's records;

(v)   an injunction requiring that the Senior Director of the Office of Student Conduct cause to be destroyed any record of the disciplinary complaint made against Plaintiff;

(vi)   a judgment declaring that the defendant violated Plaintiff's rights to due process of law;

(vii)   monetary damages;

(viii)  attorney's fees and costs of suit; and

(ix)   such other relief as deemed necessary and just by this Court.

Respectfully Submitted,


January 23, 2018

s/ Andrew Shubin
Andrew Shubin
ID #63263
333 South Allen Street
State College, PA 16801
(814) 867-3115
(814) 867-8811 fax
shubin@statecollegelaw.com

*Attorney for Plaintiff,*
*John Doe*