## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN DOE,

          Plaintiff,

      v.

THE PENNSYLVANIA STATE
UNIVERSITY, DANNY SHAHA,
KAREN FELDBAUM, and SPENCER
PETERS,

          Defendants.

No. 4:18-CV-00164

(Judge Brann)

## MEMORANDUM OPINION

### AUGUST 21, 2018

Defendants moved to dismiss John Doe's Complaint. For the reasons that follow, that motion will be granted in part and denied in part.

## I.    BACKGROUND[1]

In August 2014, John Doe and Jane Roe[2] were both undergraduate students at The Pennsylvania State University's ("PSU's") University Park Campus.[3] In the early morning hours of August 10, 2014, a sexual encounter occurred between the

---

[1] When considering a motion to dismiss for failure to state a claim, a court assumes the truth of all factual allegations made in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The material in this section, then, is taken entirely from Mr. Doe's Complaint, ECF No. 1, and is presumed true for present purposes.

[2] To protect the students' privacy, Plaintiff is proceeding before this Court under the pseudonym "John Doe," and has referred to his accuser as "Jane Roe." ECF No. 12.

[3] Complaint (ECF No. 1) ¶¶ 36-37.

two of them while they were alone in Mr. Doe's dorm room.[4]  Mr. Doe maintains that the encounter was consensual.[5]  Ms. Roe, however, maintains that it was not,[6] and consequently filed sexual assault complaints with PSU's Office of Student Conduct as well as University Police.[7]

## A.    The Investigative Model

PSU conducted an inquiry into Ms. Doe's complaint using a procedure it dubbed the "Investigative Model."[8]

Pursuant to this model, sexual assault complaints are assigned to an "Investigator," who interviews the complainant and respondent separately (as well as any other "possible witnesses") in order "to collect information regarding the allegation."[9]  This information is gathered into an "Investigative Packet," which the parties may review and respond to.[10]  These responses may prompt the Investigator to "address and correct . . . factual inaccuracies, misunderstandings,

---

[4]  *Id.* ¶ 41.

[5]  *Id.* ¶ 42.

[6]  *Id.* ¶¶ 42-43.

[7]  *Id.* ¶ 46.

[8]  *See* Complaint ¶¶ 9-34.

[9]  PSU's Code of Conduct & Student Conduct Procedures ("Code of Conduct") (Ex. 2 to the Complaint; ECF No. 6) §§ V.D.2.a-.b, .e.

[10]  *Id.* §§ V.D.2.f-.g.

etc." in the Investigative Packet, and may also prompt him or her to "conduct additional investigation as appropriate."[11]

If the Investigator decides to revise the packet as a result of such additional investigation, the parties are to be given another chance to "review and respond to" it.[12] When this iterative process is complete, the Investigator will "finalize[]" the packet and decide whether or not "the acquired information reasonably supports a Code of Conduct violation."[13] If it does, "charges will be assigned"; if it does not, "the case will be closed."[14]

If charges are assigned, both parties are given another opportunity to respond, which responses are forwarded along with the Investigative Packet to the school's "Title IX Decision Panel."[15] This panel, made up PSU faculty and staff members,[16] uses the preponderance of the evidence standard to decide whether the respondent was "responsible" for the charged conduct.[17] The panel also decides on the "appropriate sanction[]," if applicable.[18] These decisions are based entirely on

---

[11] *Id.* § V.D.2.h.

[12] *Id.*

[13] *Id.* §§ V.D.2.i-.k.

[14] *Id.* §§ V.D.2.j-.k.

[15] *Id.* § V.D.2.k.i.

[16] *Id.* § II.Q.

[17] *Id.* § V.D.2.k.iii.

[18] *Id.*.

the paper record before the panel; no in-person testimony is permitted by either the complainant or the respondent.[19]

## B. PSU's Investigation of the August 10, 2018 Encounter

After Ms. Roe filed her complaint, Defendant Danny Shaha, in his capacity as Senior Director of PSU's Office of Student Conduct, initiated disciplinary proceedings against Mr. Doe.[20] Defendant Spencer Peters (a former University Police investigator who was involved in the initial criminal investigation of Ms. Roe's complaint[21]) was assigned as the case's Investigator, and he was—according to a letter sent to Mr. Doe from the Office of Student Affairs—to be "considered a neutral fact finder."[22]

Pursuant to the Investigative Model's procedures, Mr. Peters conducted a series of separate, alternating meetings with Ms. Roe and Mr. Doe, during which the parties spoke about the sexual encounter and commented on the other's previous statements.[23] At two of these meetings, Mr. Peters directed "a few follow[-]up questions" to Ms. Roe "at the request of" Mr. Doe.[24] Mr. Peters also

---

[19] *See id.* § V.D.2.

[20] Complaint ¶ 47.

[21] *Id.* According to the Complaint, "the University [P]olice placed the [criminal] case on 'inactive' status after unsuccessfully trying to engage Ms. Roe in the investigative process." *Id.* ¶ 45.

[22] Ex. 9 to the Complaint (ECF No. 6) at 2.

[23] Mr. Peter's Investigative Packet (Ex. 13 to the Complaint; ECF No. 7) at 2-19.

[24] *Id.* at 17-18.

met with several witnesses—including Ms. Roe's roommate and a nurse who examined Ms. Roe after the incident—who spoke to Mr. Peters about their observations of, and interactions with, Ms. Roe and Mr. Doe before and after the sexual encounter.[25]  Based on his investigation, Mr. Peters "determined [that] there was enough information to reasonably support" charging Mr. Doe with nonconsensual sexual activity.[26]  As a result, the written materials were sent to the Office of Student Conduct.[27]  Karen Feldbaum, in her capacity as associate director of that office, forwarded the materials to a Title IX Decision Panel.[28]

When the panel met to discuss Mr. Doe's case on December 17, 2015, its members received copies of several additional documents from Ms. Feldbaum, presumably to guide the panel while it was making its decision.[29]  One of these documents was titled "A Decision-Making Model for Sexual Misconduct Cases," which defined "sexual misconduct" and noted that "the focus of concern" for such cases "is whether consent was expressed in a context in which it can be considered valid."[30]  Another document defined the preponderance of the evidence standard, noting that "[i]f the panel believes that the information provided indicates that it is

---

[25]  *Id.* at 2-19.

[26]  *Id.*at 1.

[27]  Complaint ¶ 58.

[28]  *Id.*

[29]  Complaint ¶ 59.

[30]  Ex. 4 to the Complaint (ECF No. 6).

more likely than not that a violation occurred, then [it] should find the student responsible for the violation," even if the panel is "not . . . completely convinced," or "ha[s] consideration reservation."[31]  And a third document indicated that "the percentage of false reports [of sexual assault] is 2%."[32]

Pursuant to the procedures detailed above, neither Ms. Roe nor Mr. Doe were permitted to appear before the panel, which issued its decision finding Mr. Doe "responsible" for the charged conduct less than a week later.[33]  As a result of that finding, Mr. Doe was suspended from PSU for two semesters and lost his on-campus housing privileges.[34]

Mr. Doe instituted this suit against PSU, Mr. Peters, Mr. Shaha, and Ms. Feldbaum on January 23, 2018.[35]  His single-claim complaint argues that various aspects of the Investigative Model—as designed and as implemented in his case, individually and in the aggregate—violated his rights under the Due Process Clause.[36]  He seeks (1) declarations that PSU's Investigative Model was unconstitutional, both facially and as applied to his case; (2) injunctions requiring

---

[31]  Ex. 6 to the Complaint (ECF No. 6).

[32]  Ex. 3 to the Complaint (ECF No. 6).

[33]  Complaint ¶ 61.

[34]  Complaint ¶ 68; Ex. 15 to the Complaint (ECF No. 7).

[35]  ECF No. 1.

[36]  Complaint ¶¶ 69-95.

PSU to reverse the panel's decision, expunge his disciplinary records, and reinstate him as a student in good standing; and (3) monetary damages.[37]

Defendants moved to dismiss Mr. Doe's complaint on March 26, 2018.[38] Their supporting brief argues: (1) that this Court does not have subject-matter jurisdiction over Mr. Doe's claims for injunctive relief; (2) that Mr. Doe has failed to state a claim under the Due Process Clause; and (3) that the claims against the individual defendants are redundant or barred by qualified immunity.[39]

## II. DISCUSSION

### A. Standard of Review

When considering a motion to dismiss for failure to state a claim upon which relief may be granted,[40] a court assumes the truth of all factual allegations in the plaintiff's complaint and draws all inferences in favor of that party;[41] the court does not, however, assume the truth of any of the complaint's legal conclusions.[42] If a complaint's factual allegations, so treated, state a claim that is plausible – *i.e.*,

---

[37] *Id.* ¶¶ (i)-(ix).

[38] ECF No. 18.

[39] ECF No. 22.

[40] Federal Rule of Civil Procedure 12(b)(6).

[41] *Phillips v. County Of Allegheny*, 515 F.3d 224, 228 (3rd Cir. 2008).

[42] *Ashcroft v. Iqbal*, 556 U.S. at 678 (2009). *See also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3rd Cir. 2016).

if they allow the court to infer the defendant's liability – the motion is denied; if they fail to do so, the motion is granted.[43]

### B. Whether This Court Has Subject-Matter Jurisdiction Over Mr. Doe's Claims for Injunctive Relief

Defendants argue that Mr. Doe's claims for injunctive relief should be dismissed because this Court lacks subject-matter jurisdiction over them. Specifically, Defendants argues that there is no active case or controversy between the parties vis-à-vis Mr. Doe's request for injunctive relief, and that Mr. Doe cannot demonstrate an injury in fact capable of resolution through such injunctive relief. In support of this argument, Defendants note (1) that Mr. Doe's suspension period is over and that, according to a declaration executed by Ms. Feldbaum,[44] Mr. Doe would be "considered a student in good standing" if he were to re-enroll at PSU; (2) that there is no mark on Mr. Doe's academic transcript referencing the disciplinary action taken against him; (3) that Mr. Doe has not alleged that he may be "subjected to further investigation or disciplinary action" as a result of the August 10, 2014 incident; and (4) that Mr. Doe "has not shown how [his] previous sanction or any adjudication associated with it has concretely harmed or has the potential to harm him."[45]

---

[43] *Id.*

[44] Ex. A to Defendants' Brief in Support of their Motion to Dismiss (ECF No. 22-1).

[45] Defendants' Brief in Support of their Motion to Dismiss (ECF No. 22) at 7-12.

Defendants' arguments are largely without merit. First, while Mr. Doe admits that Ms. Feldbaum's declaration moots his request to be reinstated at PSU in good standing,[46] his Complaint does *not* seek to terminate his suspension, which has unquestionably already run its course. Second, Mr. Doe is requesting alteration of his *disciplinary* file, not his academic transcript. Third, Mr. Doe is not seeking injunctive relief against "*further* investigation or disciplinary action," but is instead seeking to eliminate the record of the consequences of *past* investigation and disciplinary action. And fourth, PSU undoubtedly keeps records of its disciplinary proceedings, including those proceedings' results and consequences, the existence of which, Mr. Doe alleges, "sullies his reputation and jeopardizes his future livelihood";[47] Mr. Doe, then, has alleged adequate, actual, and concrete harm.[48]

This Court, therefore, has subject-matter jurisdiction over Mr. Doe's claims for injunctive relief.

---

[46]  Mr. Doe's Brief in Opposition to Defendants' Motion to Dismiss (ECF No. 25) at 14 n.61.

[47]  Complaint at 3.

[48]  *See Goss v. Lopez*, 419 U.S. 565, 576 (1975) (noting a "liberty interest in reputation"); *id.* ("'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,' the minimal requirements of the [Due Process] Clause must be satisfied.") (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)); *see also Winnick v. Manning*, 460 F.2d 545, 548 n.3 (2nd Cir. 1972) ("Notations of [the student-plaintiff's] suspension and probation continue to mar his under-graduate record. Accordingly, even though [the student-plaintiff] requests no monetary damages, this case is not moot.").

### C. Whether Mr. Doe Has Stated a Claim Under the Due Process Clause

Defendants argue that the investigation into the alleged nonconsensual sexual activity committed by Mr. Doe was constitutionally sufficient and that, therefore, he has failed to state a claim for violation of his procedural due process rights.[49] Mr. Doe, conversely, argues that the Investigative Model's use during his disciplinary proceedings failed to adequately safeguard the property interest he had in his PSU education as well as the liberty interest he had in his reputation. Among other things, Mr. Doe takes issue with the fact that the panel heard no live testimony from him, Ms. Roe, or any other witness, which necessarily eliminated not only his opportunity to speak personally to the panel, but also his opportunity to conduct any sort of cross-examination of Ms. Roe in front of it.

Defendants do not dispute the fact that Mr. Doe had a property interest in continuing his education at PSU and a liberty interest in his reputation, nor could they.[50] Defendants also do not dispute that the Due Process Clause of the

---

[49] Defendants also argue that Mr. Doe has failed to state a *substantive* due process claim. This Court, however, does not read Mr. Doe's complaint as attempting to state such a claim (nor does Mr. Doe's brief argue about any alleged substantive due process violations). Therefore, this argument of Defendants' will not be addressed.

[50] *See Goss*, 419 U.S. at 576 (noting the student-plaintiff's "property interest in education benefits temporarily denied" and his "liberty interest in reputation"); *id.* at 579 ('The student's interest is to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences."); *Gorman v. University of Rhode Island*, 837 F.2d 7, 12 (1st Cir. 1988) ("There is no doubt that due process is required when a decision of the state implicates an interest protected by the [F]ourteenth [A]mendment. It is also not questioned that a student's interest in pursuing an education is included within [that] amendment's

Fourteenth Amendment places certain limits on how PSU, as state-sponsored school, could deprive Mr. Doe of those interests.[51] The question, of course, "remains what process is due"[52]—*i.e.*, what steps PSU needed to take before adjudicating Mr. Doe "responsible" for nonconsensual sexual activity and suspending him for a year.

---

protection of liberty and property."); *Dixon v. Alabama State Bd. of Ed.*, 294 F.2d 150, 157 (5th Cir. 1961) ("The precise nature of the private interest involved in this case is the right to remain at a public institution of higher learning in which the plaintiffs were students in good standing."); *Plummer v. University of Houston*, 860 F.3d 767, 773 (5th Cir. 2017) (noting that the student-plaintiffs "have a liberty interest in their higher education"); *Doe v. University of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017) ("Suspension clearly implicates a protected property interest, and allegations of sexual assault may impugn a student's reputation and integrity, thus implicating a protected liberty interest."); *Nash v. Auburn University*, 812 F.2d 655, 667 (11th Cir. 1987) (noting that the student-plaintiffs' "interest in continuing their veterinary studies was doubtless great"); *Furey v. Temple University*, 884 F. Supp. 2d 223, 247 (E.D. Pa. 2012) (noting that the student-plaintiff's "interest was avoiding unfair or mistaken exclusion from the benefits of the educational system[, which] included the loss of education, potential damage to the student's reputation, and potential interferences with later opportunities for education and employment"); *see also Palmer by Palmer v. Merluzzi*, 868 F.2d 90, 95 (3d Cir. 1989).

[51] *See Goss*, 419 U.S. at 581 ("Students facing temporary suspension have interests qualifying for protection of the Due Process Clause . . . ."); *Gorman*, 837 F.2d at 12 ("[A] student facing expulsion or suspension from a public educational institution is entitled to the protections of due process."); *Winnick*, 460 F.2d at 548 ("While there remains many vexing questions as to what due process requires in school disciplinary proceedings, a fundamental requirement is that a hearing must be accorded before an impartial decision maker."); *Palmer by Palmer*, 868 F.2d at 93 ("The answer seems clear . . . [that] some process was due" to a suspended student); *Dixon*, 294 F.2d at 158 (noting that the Due Process Clause "requires notice and some opportunity for a hearing before a student at a tax-supported college is expelled for misconduct"); *Doe v. University of Cincinnati*, 872 F.3d at 396 ("The Due Process Clause guarantees fundamental fairness to state university students facing long-term exclusion from the educational process."); *Nash*, 812 F.2d at 660-61 ("The [D]ue [P]rocess [C]lause . . . guards against the risk of unfair suspension . . . ."); *Furey*, 884 F. Supp. 2d at 246 ("There is no dispute that the plaintiff, a student at a state-funded school, is entitled to procedural due process in a disciplinary action against him.").

[52] *Goss*, 419 U.S. at 577.

In *Goss v. Lopez*, the United States Supreme Court determined that "students facing suspension [from public schools] must be given some kind of notice and afforded some kind of hearing."[53]   In that case, where students were facing suspensions of up to ten days, the court specifically held that the Due Process Clause required "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."[54]   The Supreme Court noted, however, "that the timing and content of the notice and the nature of the hearing" in other cases "will depend on appropriate accommodation of the competing interests involved,"[55] specifically indicating that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures."[56]

When deciding "what process is due" in student disciplinary proceedings, courts interpreting and applying *Goss* have utilized the familiar three-part test from *Mathews v. Eldridge*.[57]   Those courts have therefore considered (1) the students' "private interest[s] that will be affected by the official action"; (2) the schools' interest, "including the function involved and fiscal and administrative burdens that

---

[53]   *Id.* at 579.

[54]   *Id.* at 581.

[55]   *Id.* at 579.

[56]   *Id.* at 584.

[57]   424 U.S. 319 (1976); *see, e.g.*, *Palmer by Palmer*, 868 F.2d at 95.

the additional or substitute procedural requirement would entail"; and (3) the accuracy of existing procedures and "the probable value, if any, of additional or substitute procedural safeguards."[58]

As noted, Mr. Doe's private interests are his continued education at PSU as well as his reputation. The Supreme Court has already noted that a ten-day suspension is "a serious event";[59] Mr. Doe's year-long suspension, therefore, is correspondingly more grievous.[60] And the potential damage to Mr. Doe's reputation is at least equally weighty, if not more so—after all, in addition to a tarnished disciplinary record, he is also facing the stigma of being labeled "responsible" for engaging in nonconsensual sexual intercourse.[61]

---

[58] *Id.* at 335.

[59] *Goss*, 419 U.S. at 576.

[60] *See Dixon*, 294 F.2d at 157 (noting that the student-plaintiff's interest was "the right to remain at a public institution of higher learning," and that it "requires no argument to demonstrate that education is vital and, indeed, basic to civilized society"); *Newsome v. Batavia Local School Dist.*, 842 F.2d 920, 925 (6th Cir. 1988) (discussing the "important interest that a public school student has in his education"); *Flaim v. Medical College of Ohio*, 418 F.3d 629, 634 (6th Cir. 2005) (noting the student-plaintiff's "very significant interest in his continued medical education"); *Nash*, 812 F.2d at 667 (noting that the student-plaintiffs' interest in "continuing their veterinary studies was doubtless great"); *Furey*, 884 F. Supp. 2d at 247 (noting that the student-plaintiff's interest in continuing his education is "significant"); *see also Phat Van Le v. University of Medicine & Dentistry of N.J.*, 379 Fed. Appx. 171, 175 (3rd Cir. 2010) (unpublished opinion) (noting that the student-plaintiff had a "weighty" interest in "avoidance of being expelled from a professional school for academic dishonesty").

[61] *See Gabrilowitz v. Newman*, 582 F.2d 100, 103 (1st Cir. 1978) (noting that the student-plaintiff's "reputation [may] be seriously blemished" if he loses his degree); *Plummer*, 860 F.3d at 773 ("the sanctions imposed by the University [on the student-plaintiffs] could have a substantial lasting impact on [their] personal lives, educational and employment opportunities, and reputations in the community."); *id.* at 781 (noting "the impact of the 'sexual predator' stigma on [the student-plaintiffs'] careers and reputations"); *id.* at 782

---

PSU, on the other hand, seeks to maintain a safe environment for its students—with an emphasis on the word "students." PSU's mission, after all, is foundationally educational. Although PSU has an interest in maintaining discipline and order on its campuses, that interest is a means to its ultimately pedagogic end, and every dollar spent regulating and investigating its students' behavior is a dollar not spent on teaching, learning, or scholarship.[62]

---

(noting that the student-plaintiffs' interest in their "reputations in the face of serious sexual misconduct charges [was] compelling"); *Doe v. Miami University*, 882 F.3d 579, 600 (6th Cir. 2018) ("[T]he effect of a finding of responsibility for sexual misconduct on a person's good name, reputation, honor, or integrity is profound."); *Furey*, 884 F. Supp. 2d at 247 ("Expulsion also damages the student's academic and professional reputation, even more so when the charges against him are serious enough to constitute criminal behavior.").

[62] *See Goss*, 419 U.S. at 580 ("Some modicum of discipline and order is essential if the educational function is to be performed."); *Mathews*, 424 U.S. at 335 (noting the state interest includes the "fiscal and administrative burdens that [any] additional or substitute procedural requirement would entail"); *Gorman*, 837 F.2d at 13 (noting "the interest of the school administration to dismiss or expel students for the general benefit of the institution"); *id.* at 14 (noting "need to promote and protect the primary function of institutions that exists to provide education"); *id.* at 15 ("School administrators and courts recognize that procedural requirements entail the expenditure of limited resources . . . ."); *Gabrilowitz*, 582 F.2d at 106 ("Academic institutions have a significant interest in the promulgation of procedures for the resolution of student disciplinary problems."); *Palmer by Palmer*, 868 F. 2d at 96 ("The State has very strong interests in preserving a drug-free environment in its schools . . . ."); *Plummer*, 860 F.3d at 773 ("[T]he University has a strong interest in the educational process, including maintaining a safe learning environment of all its students, while preserving its limited administrative resources."); *Doe v. University of Cincinnati*, 872 F.3d at 402-03 ("[E]nsuring allegations of sexual assault on college campuses are taken seriously is of critical importance, and there is no doubt that universities have an exceedingly difficult task in handling these issues."); *id.* at 404 (noting that the school "has a strong interest . . . in eliminating sexual assault on its campus"); *Doe v. Miami University*, 882 F.3d at 599 (noting the school's "legitimate interest in investigating alleged violations of its student code of conduct and disciplining those found responsible"); *Furey*, 884 F. Supp. 2d at 247 ("The school's interest included the need to maintain order and discipline in a way that contributed to the educational process and did not unduly burden its limited resources"); *see also Phat*

Complimenting this interest in discipline, however, is PSU's interest in securing *accurate* resolutions of student complaints like the one at issue here. PSU's educational mission is, of course, frustrated if it allows dangerous students to remain on its campuses. Its mission is equally stymied, however, if PSU ejects *innocent* students who would otherwise benefit from, and contribute to, its academic environment.[63]

Under PSU's Investigative Model, all of the testimony offered in this matter—Mr. Doe's, Ms. Roe's, and the witnesses'—was filtered by Mr. Peters through his Investigative Packet. That testimony appears only in paraphrased form, with virtually no actual quotes, with no indication of how Mr. Peters edited the individuals' statements to him. While it does appear that Mr. Peters directed some questions from Mr. Doe to Ms. Roe during the interviews, it is unclear whether any of Mr. Doe's questions went unasked or unanswered, and unclear

---

*Van Le*, 397 Fed. Appx. at 175 (noting "the dental school's interest in prompt disposition of the charges").

[63] *Goss*, 419 U.S. at 579 ("[I]t disserves [the student's] interest *and* the interest of the State if [a] suspension is in fact unwarranted.") (emphasis added); *Winnick*, 460 F.2d at 548 ("There is no reason to believe that [the school's] interest in doing justice to accused students is not every bit as strong as [its] interest in maintain order."); *Doe v. University of Cincinnati*, 872 F.3d at 402 ("Reaching the truth through fair procedures is an interest Doe and [the school] have in common . . . it disserves both [the student-plaintiff's] interest and the interest of the [school] if his suspension is in fact unwarranted."); *id.* at 404 (noting that the school "has a strong interest . . . [in] establishing a fair and constitutionally permissible disciplinary system"); *Plummer*, 860 F.3d at 783 (noting that the school's "interest lies in impartially adjudicating quasi criminal sexual misconduct allegation") (Jones, J., dissenting).

whether (or how) those questions were rephrased. On top of all that, there do not appear to be any guidelines in PSU's Code of Conduct & Student Conduct Procedures guiding Mr. Peters in his task or cabining his discretion. When the panel determined Mr. Doe's responsibility and sanction, it was relying solely on the Investigative Packet and its written responses.

Mr. Doe's main objection to this paper-only Investigative Model is that it prohibited him from telling his story directly to the panel, and from challenging Ms. Roe's version of events before that panel. In *Goss*, the Supreme Court "stop[ed] short" of requiring "trial-type procedures," such as live testimony and cross-examination, in every student disciplinary case.[64] Other courts, in distinguishable disciplinary situations, have also hesitated to impose such requirements.[65] In a case like this, however, where everyone agrees on virtually all

---

[64] *Goss*, 419 U.S. at 583; *see also Gorman*, 837 F. 2d at 16 ("the right to unlimited cross-examination has not been deemed an essential requirement of due process in school disciplinary cases"); *Winnick*, 460 F. 2d at 549 ("The right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings."); *Dixon*, 294 F. 2d at 159 ("This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required" in student discipline cases."); *Doe v. University of Cincinnati*, 872 F. 3d at 404 ("Cross-examination can unnecessarily formalize school expulsion proceedings precisely because it imposes the additional burden on school administrators of applying, to some extent, the rules of evidence.").

[65] *Gorman*, 837 F. 2d at 16 (no Due Process Clause violation where the student-plaintiff "had the opportunity to cross-examine his accusers," even though he was not permitted to "cross-examine his accusers on . . . allegations of bias"); *Winnick*, 460 F. 2d at 550 (no Due Process Clause violation where student-plaintiff was denied the right to cross-examine his accuser, since the "crucial fact [of his guilt] was admitted by [the student-plaintiff] himself," rendering "cross-examination . . . a fruitless exercise"); *Nash*, 812 F. 2d at 664 (no Due Process Clause violation, even though the student-plaintiffs "were not allowed to ask

salient facts except one—*i.e.*, whether or not Ms. Roe consented to sexual activity with Mr. Doe—there is really only one consideration for the decisionmaker: credibility.  After all, there were only two witnesses to the incident, with no other documentary evidence of the sexual encounter itself.  As a result, in this Court's view, the Investigative Model's virtual embargo on the panel's ability to assess that credibility raises constitutional concerns.[66]  Consequently, while this Court is consistently "mindful of [the Supreme Court's] admonition [that j]udicial

---

questions directly of the adverse witnesses at the . . . hearing," because they "were told they could pose questions of the accusing witnesses by directing their questions to the presiding board chancellor, who would then direct appellants' questions to the witnesses."); *Furey*, 884 F. Supp. 2d at 252 (prohibiting the student-plaintiff from personally cross-examining the witnesses did not, on its own, violate the Due Process Clause, since the student-plaintiff "was able to cross[-]examine the witnesses by posing questions through the [panel's] chair").

[66] *See Winnick*, 460 F. 2d at 550 ("[I]f this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing."); *Doe v. University of Cincinnati*, 872 F. 3d at 396 ("[T]he University's disciplinary committee necessarily made a credibility determination finding [the student-plaintiff] responsible for sexually assaulting [the accuser] given the exclusively 'he said/she said' nature of the case. [The school's] failure to provide any form of confrontation of the accuser made the proceeding against [the student-plaintiff] fundamentally unfair."); *id.* at 404 ("[A] case that resolves itself into a problem of credibility cannot itself be resolved without a mutual test of credibility, at least not where the stakes are this high."); *id.* at 405 ("[The student-p]laintiff is likely to succeed on the merits of his due process claim not because defendants introduced hearsay evidence against him, but because the nature of that evidence posed a problem of credibility."); *see also Doe v. Pennsylvania State University*, 276 F. Supp. 3d 300, 310 (M.D. Pa. 2017) (noting that the panel's "erroneous rejection" of questions submitted for cross-examination "constitute[d] a significant and unfair deviation from" existing procedures).  *See generally* Nicole E. Smith, Note, *The Old College Trial:  Evaluating the Investigative Model for Adjudicating Claims of Sexual Misconduct*, 117 Colum. L. Rev. 953 (2017).

The Investigative Model's problems are compounded by the *ex parte* documents given to the panel by Ms. Feldbaum.  *See Newsome*, 842 F. 2d at 927 (holding that the student-plaintiff was denied due process "when the superintendent disclosed to the school board, during [the board's] closed deliberations, new evidence which had not been presented during the open hearing at which [the student-plaintiff] and his attorney were present.").

interposition in the operation of the public school system of the Nation raises problems requiring care and restraint,"[67] Defendants' motion to dismiss Mr. Doe's due process claim for a failure to state a claim upon which relief can be granted will be denied.

### D. Whether the Individual Defendants Are Entitled to Qualified Immunity

Mr. Shaha, Ms. Feldbaum, and Mr. Peters argue that Mr. Doe's claim against them should be dismissed on qualified immunity grounds.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."[68] As the complicated analysis in the last subsection of this opinion demonstrates,[69] it cannot be said that Mr. Doe's right to personally appear before the panel and question Ms. Roe was "clearly established."[70] Therefore, this Court will dismiss the individual capacity claims against Mr. Shaha, Ms. Feldbaum, and Mr. Peters.[71]

---

[67] *Goss*, 419 U.S. at 578.

[68] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[69] *See supra* nn. 52-54.

[70] *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

[71] Those defendants also argue that the official capacity claims against them should be dismissed as duplicative of the claim against PSU. Mr. Doe agrees. Therefore, those claims will be dismissed as well.

## III. CONCLUSION

For the reasons stated above, Mr. Doe's request for an injunction requiring PSU to reinstate him as a student in good standing will be dismissed as moot, and all claims against Mr. Shaha, Ms. Feldbaum, and Mr. Peters will be dismissed with prejudice. Mr. Doe's claim against PSU, however, will survive.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge